# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

CURTIS McKINNES,

Plaintiff,

v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,[1]

Defendant.

No. 12 C 2868

Magistrate Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Plaintiff Curtis McKinnes filed this action seeking reversal of the final decision of the Commissioner of Social Security denying his application for Supplemental Security Income under Title XVI of the Social Security Act (Act). 42 U.S.C. §§ 405(g), 1381 et seq. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Plaintiff has filed a request to reverse the ALJ's decision and remand for additional proceedings. For the reasons stated below, the Commissioner's decision is affirmed.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover Supplemental Security Income (SSI), a claimant must establish that he or she is disabled within the meaning of the Act. *York v. Massanari*, 155 F. Supp.

---

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security and is substituted for her predecessor, Michael J. Astrue, as the proper defendant in this action. Fed. R. Civ. P. 26(d)(1).

2d 973, 977 (N.D. Ill. 2001).[2] A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 416.909, 416.920; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

[2] The regulations governing the determination of disability for SSI are found at 20 C.F.R. § 416.901 et seq. The standard for determining SSI is virtually identical to that used for Disability Insurance Benefits (DIB). *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

## II. PROCEDURAL HISTORY

Plaintiff applied for SSI on March 14, 2005, alleging that he became disabled on July 30, 2000, due to a right leg injury and a heart condition. (R. at 61, 69–70, 285). The application was denied initially and on reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id.* at 54–66, 285). On June 7, 2007, Plaintiff, represented by counsel, testified at a hearing (First Hearing) before an Administrative Law Judge (ALJ). (*Id.* at 190–281, 285). The ALJ also heard testimony from Alzater Hodges, Plaintiff's grandmother, and Grace Gianforte, a vocational expert (VE). (*Id.* at 88, 190–281, 285). The ALJ denied Plaintiff's request for benefits on September 25, 2007. (*Id.* at 17–32, 285).

After the Appeals Council denied review, Plaintiff appealed to the federal court, and the case was remanded by agreement.[3] (R. at 4–7, 285, 310–13). Subsequently, the Appeals Council vacated the decision, remanded the case to an ALJ for further proceedings, and ordered the ALJ to (1) give further consideration to whether Plaintiff can ambulate without use of a case, (2) reassess Plaintiff's RFC considering whether use of a cane is a medical necessity, and (3) obtain supplemental evidence from a VE to clarify the effect of the assessed limitations on the Plaintiff's occupational base. (*Id.* at 310–11).

On remand, Plaintiff, represented by counsel, testified at a hearing on February 10, 2011 (Second Hearing). (R. at 286, 508–61). The ALJ also heard testimony from

---

[3] While waiting for a decision on his initial claim, Plaintiff filed another claim, which was dismissed. (R. at 333–37).

William H. Newman, M.D., an impartial medical expert (ME), and Richard J. Hamersma, Ph.D., a VE. (*Id.* at 286, 306, 331, 508–61).

The ALJ denied Plaintiff's request for benefits on January 20, 2012. (R. at 285–305). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity since March 14, 2005, the application date. (*Id.* at 288). At step two, the ALJ found that Plaintiff's mild obesity is a severe impairment. (*Id.*). At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meet or medically equal the severity of any of the listings enumerated in the regulations. (*Id.* at 289).

The ALJ then assessed Plaintiff's residual functional capacity (RFC)[4] and determined that he has the RFC to "perform a wide range of light and sedentary work," as defined in 20 C.F.R. § 416.967(b):

> He can lift, carry, push and/or pull up to 20 pounds occasionally and up to 10 pounds frequently, although he should not do constant repetitive pushing or pulling against resistance with the right lower extremity. Because of his obesity and musculoskeletal complaints, he should never climb ladders, ropes or scaffolds or work on moving or unstable surfaces and should not do work that would expose him to unprotected heights or unguarded hazardous equipment. I find further that [Plaintiff's] pain, "attacks," and other symptoms would distract him only rarely during a workday, to the extent that he was off task and not productive, outside break time.

(R. at 290–91). At step four, the ALJ determined that Plaintiff has no past relevant work. (*Id.* at 302). At step five, based on Plaintiff's RFC, age, education, work expe-

---

[4] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. § 404.1520(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft*, 539 F.3d at 675–76.

rience, and the VE's testimony, the ALJ determined that that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, including cashier, hand packer, and telephone solicitor. (*Id*. at 303–04). Accordingly, the ALJ concluded that Plaintiff was not suffering from a disability as defined by the Act. (*Id*. at 304–05).

Plaintiff did not file exceptions with the Appeals Council, and the Appeals Council did not assume jurisdiction (Compl. ¶ 7), leaving the ALJ's decision as the final decision of the Commissioner, 20 C.F.R. § 416.1484; *Corder v. Barnhart*, 504 F. Supp. 2d 351, 353 (N.D. Ill. 2007); *Rounds v. Colvin*, No. 11 C 3410, 2013 WL 3063982, at *1 (N.D. Ill. June 18, 2013). Plaintiff now seeks judicial review of the ALJ's decision.

## III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Act. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004). "Substantial evidence must be more

than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). "This deference is lessened, however, where the ALJ's findings rest on an error of fact or logic." *Thomas v. Colvin*, 13-2602, —F.3d—, 2014 WL 929150, at *2 (7th Cir. Mar. 11, 2014). The Court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young,* 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## IV. MEDICAL EVIDENCE

The earliest medical record is dated October 4, 2001, when Plaintiff reported a 1994 gunshot wound to his right leg and complained of occasional aching in cold weather. (R. at 138–39). He also reported being assaulted a year earlier, suffering an injury to the left side of his chest. (*Id.*). Although Plaintiff complained of a heart murmur, none was found on examination, and he did not have any signs or symp-

toms of cardiac impairment. (*Id.*). A chest x-ray taken the same day was negative. (*Id.* at 140–41).

Plaintiff began treating with Conrad May, M.D., on February 24, 2004. (R. at 148; *see id.* at 167). He complained of right leg pain, and acknowledged drinking alcohol and smoking marijuana. (*Id.* at 148). On March 23, 2004, Plaintiff again complained of right leg problems, stating that it varies between "locking up" and having difficulty bearing weight. (*Id.* at 149). Dr. May referred him for an x-ray. (*Id.*). Plaintiff had the x-ray on April 6, 2004, which was unremarkable. (*Id.* at 160). On May 3, 2004, Dr. May recommended that Plaintiff seek an MRI of his right knee, suggesting to him how to get one without charge. (*Id.* at 150).

On July 13, 2004, Plaintiff presented to the Stroger Hospital emergency room, complaining of increased right knee pain and episodes of knee swelling related to slipping four months previously. (R. at 124–26). On examination, Plaintiff had normal strength and full range of motion of his right knee, but experienced increased pain with flexion of the knee. (*Id.* at 124). An x-ray showed mild soft tissue swelling but no fracture. (*Id.* at 125). Plaintiff was advised to apply ice and elevate the knee, and he was referred for physical therapy. (*Id.*). He was prescribed 1000mg Tylenol, 25mg amitriptyline,[5] and 800mg ibuprofen. (*Id.*).

On March 28, 2005, Plaintiff complained that he was unable to stand because of leg pain. (R. at 151). Dr. May prescribed 600mg Motrin and Vicodin. (*Id.*). On July 11, 2005, Plaintiff complained again of leg problems, and Dr. May refilled Plaintiff's

---

[5] Elavil (amitriptyline) is an antidepressant. <www.drugs.com>

prescriptions. (*Id.* at 152). On October 25, 2005, Plaintiff reported pain in his right leg. (*Id.* at 153). On March 21, 2006, Plaintiff reported feeling "okay." (*Id.* at 152).

On April 23, 2005, Jeffrey J. Ryan, M.D., conducted an internal medicine consultative examination on behalf of the Commissioner. (R. at 111–16). Plaintiff stated that he suffered a gunshot wound to his right leg in 1994 and a subsequent fall injury in 2000. (*Id.* at 111; *see id.* at 180). Ever since that time, he has had persistent severe pain making it difficult for him to walk without a cane. (*Id.* at 111). Even using the cane, he can walk only a half block and can stand for no more than 15–20 minutes. (*Id.*). Plaintiff stated that he had a heart murmur in the past, which caused his left chest to swell-up when he used his arms. (*Id.* at 112). On examination, Dr. Ryan found Plaintiff's gait very slow and antalgic; he had difficulty walking and was unable to ambulate more than 20 feet without the use of his cane. (*Id.*). He was unable to perform toe, heel, tandem, or squat and rise secondary to pain in his right leg. (*Id.* at 113). He had some diminished strength in the right leg secondary to pain; otherwise strength, sensation, and deep tendon reflexes were symmetric and within normal limits. (*Id.*). Plaintiff had full, painless range of motion of all joints except for his right knee, which was limited in flexion to 90 degrees.[6] (*Id.* at 112). Dr. Ryan noted no swelling, thickening, or deformity of any joint. (*Id.*). He di-

---

[6] While a knee can fully flex up to 140 degrees, only 60–70 degrees of flexion are needed for normal walking and about 90 degrees to be able to rise from a seated position. *See* Brianne Grogan, *What Is the Normal Range of Motion of the Knee?*, available at <www.livestrong.com>; Frank R. Noyes, M.D., *The Knee—Range of Motion*, available at <www.kneeguru.co.uk>

agnosed right leg pain and a heart murmur, although he was unable to appreciate a heart murmur on examination. (*Id.* at 113).

On June 7 and September 13, 2005, Plaintiff's file was reviewed by state-agency physicians, who concluded that Plaintiff's condition was not severe enough to be considered disabling. (R. at 54–55, 57–61).

An MRI of Plaintiff's right knee joint on March 18, 2006, was normal. (R. at 163). On March 21, 2006, Plaintiff reported swelling in his right leg. (*Id.* at 152). Dr. May diagnosed right knee tendinitis and chronic pain, and referred him for physical therapy. (*Id.* at 152, 183). Plaintiff began physical therapy on March 24, 2006. (*Id.* at 180). Plaintiff described his "excruciating" right knee pain as 8/10 on the pain scale. (*Id.*). On examination, Plaintiff's right knee was moderately swollen, with limited range of motion secondary to pain and swelling. (*Id.*). The right knee was limited in flexion to 100 degrees, but otherwise Plaintiff's right knee and ankle were all within functional limits. (*Id.* at 181). Plaintiff demonstrated an antalgic gain when ambulating with his cane; he also had difficulty on stairs and was unable to squat. (*Id.*). The therapist recommended that Plaintiff use a knee brace. (*Id.*). During the subsequent physical therapy sessions, Plaintiff complained of pain and insisted that he was not getting better. (*Id.* at 175–77). He was discharged from therapy on April 28, 2006, after refusing to continue treatment. (*Id.* at 173).

On October 20, 2006, Plaintiff presented to Kevin Conner, M.D., for a nerve conduction study. (R. at 143–45). Mild abnormalities were found in the superficial peroneal and sural nerves of the right leg, with superficial to mild effects on lower leg

and foot.[7] (*Id.* at 144). Dr. Conner concluded that the findings were consistent with generalized peripheral neuropathy involving sensory fibers only.[8] (*Id.* at 145). He opined that the neuropathy could be caused by a metabolic or systemic disease and recommended further diagnostic testing. (*Id.*).

On January 19, 2007, Plaintiff complained of pain in his right leg and back. (R. at 155). Dr. May diagnosed neuropathy and prescribed 600mg Motrin and Vicodin. (*Id.*). He opined that Plaintiff "is totally and permanently disabled with a neuropathy of the lower extremities." (*Id.* at 146).

At the First Hearing on June 7, 2007, Plaintiff testified that he stopped driving in 2000 because of his leg pain. (R. at 203). He was unable to work because of the chronic pain and swelling he has in his right leg. (*Id.* at 209, 222). The pain starts at his right knee and goes down to his foot and sometimes up to his thigh, back, and hand. (*Id.* at 220–21, 231). His medicine alleviates the pain only for two hours. (*Id.* at 220, 222). Sometimes ice or heating pads are able to alleviate the pain temporarily. (*Id.* at 234). Two or three times a week, the pain becomes so intense that Plaintiff has an "attack"; his whole leg shakes and he "balls up in a knot." (*Id.* at 224–25). On occasion, the pain causes his vision to become blurry. (*Id.* at 239).

---

[7] The superficial peroneal nerve affects the foot. <en.wikipedia.org/wiki/Superficial_ fibular_nerve> The sural nerve has a "superficial" impact on the foot and lower leg. <en.wikipedia.org/wiki/Sural_nerve>

[8] Peripheral neuropathy "is damage or disease affecting nerves, which may affect sensation, movement, gland or organ function, and other aspects of health, depending on the type of nerve affected." <http://en.wikipedia.org/wiki/Peripheral_neuropathy> Generalized neuropathies or polyneuropathies "present as pain, numbness, tingling, and, sometimes, weakness that affect both sides of the body." Jeffrey W. Ralph, M.D., *Neuropathy 101*, available at <http://neuropathyaction.org/neuropathy_101/index.htm>

On a typical day, Plaintiff gets up in the morning in pain. (R. at 227). He is able to alleviate the pain with stretching exercises recommended by his physical therapist. (*Id.*). When the pain gets bad, he has to lie down. (*Id.*). He is unable to do any household chores or to help his grandmother around the house. (*Id.* at 227–28). Plaintiff is able to lift about ten pounds and can stand for about 20 minutes before needing to sit. (*Id.* at 230). He can walk only a half block before needing a rest. (*Id.* at 231). He uses a cane for standing and walking. (*Id.* at 237). Plaintiff's pain makes it difficult to concentrate for more than 30 or 45 minutes at a time. (*Id.* at 236). He is often unable to sleep through the night because of sharp leg pain. (*Id.* at 234–35).

Plaintiff's grandmother testified that Plaintiff is unable to help around the house when his pain becomes severe. (R. at 249). He "balls up" in pain two to three times a week. (*Id.* at 250). When Plaintiff has these "attacks," they last about 15 minutes. (*Id.* at 252).

On June 16, 2007, Plaintiff complained of pain in his leg. (R. at 428). Dr. May diagnosed neuropathy. (*Id.*). On June 25, 2007, Dr. May completed a Physical Capacity Questionnaire. (*Id.* at 167–70). He diagnosed lower extremity neuropathy, demonstrated by lower extremity weakness and right leg numbness. (*Id.* at 167). Dr. May opined that Plaintiff would regularly experience symptoms severe enough to interfere with the attention and concentration necessary to perform even simple work tasks. (*Id.* at 168). He concluded that Plaintiff could walk two blocks without rest or pain and could stand or walk two hours and sit four hours in an eight-hour workday. (*Id.*). Dr. May stated that Plaintiff needs a cane for even occasional stand-

ing or walking. (*Id.* at 169). He opined that Plaintiff could frequently lift 10 pounds and occasionally lift 20 pounds. (*Id.*). He further opined that Plaintiff could occasionally twist, stop, crouch/squat, climb ladders, and climb stairs. (*Id.*).

On October 17, 2007, Plaintiff complained of feeling shaky. (R. at 427). A physical examination was unremarkable. (*Id.* at 444–45). Dr. May diagnosed fibromyalgia and prescribed 7.5mg Mobic, 500mg acetaminophen, 600mg Motrin, 300mg gabapentin, and 10mg Elavil.[9] (*Id.* at 427, 440, 445). An EEG on October 24, 2007, was interpreted as normal. (*Id.* at 459).

Plaintiff returned for a follow-up with Dr. May on April 8, 2008. (R. at 427, 447–49). He reported episodes of "falling out." (*Id.* at 447). The physical examination results, including musculoskeletal and neurological, were all normal. (*Id.* at 447–48). Dr. May diagnosed a history of fibromyalgia and continued his prescriptions for Mobic, acetaminophen, Motrin, and Elavil. (*Id.* at 427, 449). A month later, on May 6, 2008, Plaintiff reported "falling out" and spasms. (*Id.* at 450). Dr. May found that Plaintiff had a "weak" leg, but otherwise his examination was unremarkable. (*Id.* at 450–51). Dr. May diagnosed neuropathy. (*Id.* at 452).

On June 17, 2008, Fauzia A. Rana, M.D., conducted an internal medicine evaluation on behalf of the Commissioner. (R. at 434–36). Dr. Rana found Plaintiff to be a "poor historian." (*Id.* at 434). Plaintiff complained of nerve damage in his right leg and a history of heart murmur. (*Id.*). He stated that he uses a cane most of the time.

---

[9] Mobic (meloxicam) is a nonsteroidal anti-inflammatory drug. Neurontin (gabapentin) is an anti-epileptic medication, which is also used treat nerve pain. <www.drugs.com>

(*Id.*). On examination, Plaintiff offered "poor cooperation." (*Id.*). Dr. Rana found that flexion of the right knee was 115 degrees, dorsiflexion of the right ankle was 15 degrees, and plantar flexion of the right ankle was 30 degrees;[10] no evidence of tenderness, swelling, warmth, or redness in any joint; no limitation of motion of any joint; gross and fine manipulation of both hands was normal; no difficulty in lifting, holding, or turning objects with either hand; dexterity was normal; and fist and grip strength were 5/5 bilaterally. (*Id.*). Examination of Plaintiff's spine showed no local tenderness or paravertebral muscle spasm; no limitation of movement; and straight leg raises were 90 degrees. (*Id.* at 436). A neurological examination found that Plaintiff walks with a slight limp favoring the right leg, but he can walk more than 50 feet without his cane; motor power in the left lower limb was 5/5 and also 5/5 in both upper limbs. (*Id.*). Sensation to touch and pin prick were diminished in the right leg below the knee, but otherwise normal. (*Id.*). Dr. Rana also noted that motor power could not be tested in the right lower limb because of complaints of pain and poor cooperation and effort. (*Id.*). He diagnosed possible degenerative arthritis because of possible nerve damage in the right leg. (*Id.*).

On July 3, 2008, a state-agency physician reviewed Plaintiff's file, including Dr. Rana's consultative examination. (R. at 437–39). Marion Panepinto, M.D., diagnosed status post gunshot wound to right leg. (*Id.* at 437). He opined that because

---

[10] Normal dorsiflexion (movement upward) of the ankle is 0–20 degrees and plantar flexion (movement downward) is 0–50 degrees. Elizabeth Quinn, *What Is Normal Range of Motion in a Joint?*, available at <sportsmedicine.about.com> For normal walking, 10–15 degrees of plantar flexion and 10 degrees of dorsiflexion is sufficient. *Biomechanics of the Foot and Ankle*, available at <www.orthopaedicsone.com>

Plaintiff was not fully cooperative during the consultative examination, he "cannot be considered fully credible." (*Id.* at 439). Dr. Panepinto concluded that Plaintiff's "limitations were minimal" and recommended that his claim be "denied as nonsevere." (*Id.*).

On November 22, 2008, Plaintiff complained of leg and back pain, with joint swelling, which is worse in the morning. (R. at 454). When he sits, it is difficult and painful to stand up and walk. (*Id.*). Other than a swollen right knee, the physical examination was unremarkable. (*Id.* at 455). Dr. May diagnosed radiculopathy and myositis,[11] continued Mobic, acetaminophen, Motrin, and Elavil, and prescribed 30mg Tylenol/codeine. (*Id.* at 457). Dr. May also injected Plaintiff's right knee with Kenalog.[12] (*Id.*).

On December 4, 2008, Debbie L. Weiss, M.D., conducted another internal medicine consultative examination on behalf of the Commissioner. (R. at 463–68). Plaintiff complained of a chronic sharp pain in his right knee that radiates to his right foot and into his hip, which he rated as 10/10. (*Id.* at 463). His pain wakes him from sleep and is worse when he sits for more than 20 minutes with his knee flexed. (*Id.*). Sometimes when he tries to get up from a seated position, his knee gives out and he falls. (*Id.*). Plaintiff stated that he uses a prescribed cane for balance and weakness, but can walk a half block without the cane. (*Id.*). Plaintiff also complained of a his-

---

[11] Radiculopathy is a disease of the spinal nerve roots. *Stedman's Medical Dictionary* 1187 (5th ed. 1982). Myositis is a muscle inflammation. *Id.* 922.

[12] Kenalog (triamcinolone) is a corticosteroid, which reduces inflammation, redness, and swelling. <www.drugs.com>

tory of heart murmur and stated that he has recent left sided chest pain (7/10), which radiates to his arm as numbness. (*Id.* at 464). The pain lasts for 30–45 minutes but the swelling in his left arm lasts for one to two days. (*Id.*). Dr. Weiss found Plaintiff overweight but in no acute distress. (*Id.*). On examination, Plaintiff was able to walk only ten feet without assistance, very slowly, bearing his weight predominantly on his left leg. (*Id.* at 465). He was unable to heel walk, toe walk, squat, or do tandem gait. (*Id.*). He had no difficulty getting on and off the examining table. (*Id.*). His range of motion was within normal limits except for right knee flexion of 90 degrees. (*Id.* at 465, 467). A neurological examination was largely unremarkable, except sensation to pinprick was decreased in the right lower extremity, and strength in the right knee was 4/5 and right ankle was 3.5/5. (*Id.* at 465–66). Dr. Weiss concluded that Plaintiff has weakness in his right lower extremity with the loss of sensation and can walk for only ten feet without his cane. (*Id.* at 466).

On January 26, 2009, a state-agency physician reviewed Dr. Weiss's consultative examination and completed a physical RFC assessment. (R. at 469–76). Goutami Nallamothu, M.D, concluded that Plaintiff could lift ten pounds, stand or walk with a hand-held assistive device at least two hours in an eight-hour workday, sit less than six hours, and has limited ability to use lower extremity in pushing or pulling. (*Id.* at 470). Dr. Nallamothu opined that Plaintiff could never climb ladders, ropes, or scaffolds, but could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl. (*Id.* at 471). Plaintiff should also avoid hazards. (*Id.* at 473). Dr. Nallamothu found Plaintiff only partially credible: Plaintiff's self-imposed limita-

tions were more restrictive than indicated by the medical evidence. (*Id.* at 476). On March 18, 2009, a second state-agency physician affirmed Dr. Nallamothu's assessment. (*Id.* at 492–94).

On March 9, 2009, Plaintiff complained of knee, back, and chest pain. (R. at 503). Dr. May noted that Plaintiff uses a cane, and found swelling and tenderness of his knee. (*Id.* at 506). Otherwise, the physical examination was unremarkable. (*Id.* at 505–06). Dr. May diagnosed neuropathy and radiculopathy, prescribed 600mg Motrin, three times daily, and advised Plaintiff to apply a hot towel to affected area three times daily. (*Id.* at 506).

On August 8, 2009, Plaintiff complained of pain "everywhere," but especially of his right knee. (R. at 499). His symptoms included joint pain, stiffness, and numbness. (*Id.* at 500). A physical examination was largely unremarkable. (*Id.* at 501–02). Dr. May diagnosed radiculopathy. (*Id.* at 502).

On December 12, 2009, Plaintiff complained of pain in his lower back and right knee. (R. at 495). A physical examination was largely unremarkable. (*Id.* at 497–98). Dr. May diagnosed degenerative joint disease, continued 7.5mg Mobic, 500mg acetaminophen, 600mg Motrin, prescribed 500mg Vicodin, and injected Plaintiff's right knee with Kenalog. (*Id.* at 495, 498).

At the Second Hearing, Plaintiff described his pain as "sharp," which starts at his right knee and spreads down to his ankle and up to his back. (R. at 529). The sharp pain precipitates weakness in his knee, which causes him to fall down. (*Id.* at 534). The pain is sometimes accompanied by blurry vision and loss of concentration.

(*Id.* at 535). On occasion, Plaintiff experiences what he describes as nerve spasms, which cause him to "ball up" in pain, shake, and lose consciousness. (*Id.* at 531). Plaintiff testified that he went to the emergency room on January 27, 2011, after his pain got worse and his whole leg, ankle, and knee were swelling. (*Id.* at 516–17). Plaintiff takes Tylenol 3 (Tylenol/codeine) for the pain and soaks his leg in hot water and Epson salts to reduce the swelling. (*Id.* at 533). He tries to do the exercises suggested by his physical therapist, which temporarily alleviates the pain and swelling. (*Id.* at 530–31).

Plaintiff is unable to perform most household chores. (R. at 536). He is able to keep his room clean and do light cooking and dishwashing, but otherwise his grandmother takes care of the house. (*Id.* at 536–37). When Plaintiff drives on rare occasions, he is able to use only his left leg. (*Id.* at 526–27). He testified that he can lift 20–30 pounds, walk 100 feet, and sit or stand for only 20 minutes before needing to change positions. (*Id.* at 538–39). Plaintiff uses a cane all the time and has difficulty climbing stairs. (*Id.* at 542).

The ME testified that Plaintiff was overweight but otherwise had no functional impairment. (R. at 546). He opined that while the medical records include a sensory peripheral neuropathy of the perineal nerve, it is of "no functional significance" and does not affect the knee. (*Id.*). The ME found that the recent consultative examinations by Drs. Rana and Weiss demonstrated "no real objective pathology" to support Plaintiff's symptoms. (*Id.* at 546–47). Nor were Dr. May's conclusions supported by the record. (*Id.* at 547). The ME was also skeptical whether the state-agency RFC

assessment was supported by the record. (*Id.* at 547–48). He found no pathology to support the RFC's extreme limitations. (*Id.* at 548). The ME did acknowledge on cross-examination that a person with a gunshot would could experience pain and difficulty with focus and concentration. (*Id.*).

## V. DISCUSSION

Plaintiff raises five arguments in support of his request to reverse and remand: (1) the ALJ erred in assessing Dr. May's opinion; (2) the ALJ erred in assessing Plaintiff's credibility; (3) the ALJ failed to properly consider Plaintiff's need for a cane; (4) the ALJ's RFC assessment lacks support; and (5) the ALJ failed to appropriately analyze Plaintiff's obesity. (Mot. 7–20). The Court addresses each argument in turn.

### A. Substantial Evidence Supports Weight Given to Dr. May's Opinion

Plaintiff contends that Dr. May's opinion was supported by the medical evidence and should have been afforded great weight. (Mot. 13–15). Plaintiff argues that the ALJ's decision lacked substantial support, failed to address Dr. May's opinion in its entirety, and did not assess the requisite check list of factors. (*Id.*).

By rule, "in determining whether a claimant is entitled to Social Security disability benefits, special weight is accorded opinions of the claimant's treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). The opinion of a treating source is entitled to controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2); *accord*

*Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). A treating physician typically has a better opportunity to judge a claimant's limitations than a nontreating physician. *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996); *Grindle v. Sullivan*, 774 F. Supp. 1501, 1507–08 (N.D. Ill. 1991). "More weight is given to the opinion of treating physicians because of their greater familiarity with the claimant's conditions and circumstances." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Therefore, an ALJ "must offer 'good reasons' for discounting a treating physician's opinion," and "can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(2); other citation omitted). In sum, "whenever an ALJ does reject a treating source's opinion, a sound explanation must be given for that decision." *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) (citing 20 C.F.R. § 404.1527(d)(2)).

On June 25, 2007, Dr. May completed a Physical Capacity Questionnaire. (R. at 167–70). He diagnosed lower extremity neuropathy, demonstrated by lower extremity weakness and right leg numbness. (*Id.* at 167). Dr. May opined that Plaintiff's neuropathy would regularly (20–33% of an 8-hour workday) cause symptoms severe enough to interfere with the attention and concentration necessary to perform even simple work tasks. (*Id.* at 168). He concluded that Plaintiff could walk only two blocks without rest or pain and could stand or walk only two hours and sit only four hours in an eight-hour workday. (*Id.*). Dr. May stated that Plaintiff needs a cane for

even occasional standing or walking. (*Id.* at 169). He opined that Plaintiff could frequently lift 10 pounds and occasionally lift 20 pounds. (*Id.*). He further opined that Plaintiff could occasionally twist, stop, crouch/squat, climb ladders, and climb stairs. (*Id.*).

In his decision, the ALJ declined to give controlling weight to Dr. May's opinion:

> Dr. May's contemporaneous progress notes and imaging studies he ordered and reviewed do not support his opinion that [Plaintiff] is or was unable, due to medical impairments, to sit throughout a workday, with typical breaks. While one examination suggests that [Plaintiff] had approximately 70% normal strength in his right lower extremity (3+/5) at the start of the course of [physical therapy (PT)], which would be expected adversely to affect [Plaintiff's] ability to do prolonged standing and walking, the record as a whole does not suggest an objective medical basis to support Dr. May's opinion about [Plaintiff's] limited ability to sit during a workday. In addition, the course of PT would be expected to improve the strength in [Plaintiff's] right leg. The rest of Dr. May's opinion suggests that [Plaintiff] could perform and sustain a wide range of sedentary and even some light work.

(R. at 297).

Plaintiff contends that the medical evidence supports Dr. May's opinion. (Mot. 14–15). On the contrary, the ME—an orthopaedic specialist—found *no* medical evidence indicating a functional impairment. (R. at 297, 546). The ME explained that the medical record contained *no* objective pathology to explain Plaintiff's symptoms. (*Id.* at 547). Indeed, diagnostic tests were largely unremarkable. (*See, e.g., id.* at 160 (April 2004: x-ray normal), 124–26 (July 2004: x-ray showed mild soft tissue swelling but no fracture and Plaintiff had normal strength and full range of motion of right knee), 112 (April 2005: full, painless range of joints, including flexion in right knee sufficient to walk and stand; no swelling, thickening, or deformity of any joint),

163 (March 2006: MRI normal), 181 (March 2006: range of movement in right knee and ankle within functional limits, including flexion in knee sufficient to walk and stand), 459 (October 2007: EEG normal), 434 (June 2008: no evidence of tenderness, swelling, warmth, or redness in any joint; no limitation of motion of any joint; gross and fine manipulation of both hands was normal; no difficulty in lifting, holding, or turning objects with either hand; dexterity was normal; and fist and grip strength were 5/5 bilaterally)). Similarly, physical examinations by Dr. May were frequently unremarkable. (*See*, *e.g.*, *id.* at 447–48 (April 2008), 450–51 (May 2008), 434 (June 2008: no evidence of tenderness, swelling, warmth, or redness in any joint; no limitation of motion in any joint, including flexion, dorsiflexion, and plantar flexion in right leg sufficient to walk and stand), 455 (November 2008: other than swollen knee, examination unremarkable), 465–67 (December 2008: range of motion within normal limits, including right knee sufficient to walk and stand; neurological examination largely unremarkable), 505–06 (March 2009: other than swelling and tenderness of right knee, examination unremarkable), 501–02 (August 2009), 497–98 (December 2009)). And state-agency physicians' reviews of the medical record in June 2005, September 2005, and July 2008 concluded that Plaintiff's impairments were nonsevere. (*Id.* at 54–55, 57–61, 437–39).

Plaintiff argues that Dr. May's sitting restriction was supported by the peripheral neuropathy diagnosis. (Mot. 14). In October 2006, Dr. Conner conducted a nerve conduction study, which indicated mild abnormalities in the superficial peroneal and sural nerves of the right leg, with superficial to mild effects on Plaintiff's

lower leg and foot. (R. at 143–45). As the ME explained, the peripheral neuropathy was *mild* and had *no* functional significance. (*Id.* at 546). Because the affected nerves were below the knee, the ME opined that they were not correlated with Plaintiff's knee complaints. (*Id.*). Further, as discussed above, *no* diagnostic tests indicated any range of motion limitations sufficient to warrant a sitting restriction.

Plaintiff also contends that the ALJ failed to address Dr. May's opinion that Plaintiff's mild neuropathy would interfere with Plaintiff's attention and concentration for up to 33% of the workday.[13] (Mot. 13–14). On the contrary, the ALJ expressly addressed Dr. May's opinion that Plaintiff's neuropathy would regularly interfere with his ability to concentrate. (R. at 296). And by adopting the ME's opinion that Plaintiff has no functional limitations from the mild neuropathy (*id.* at 297), the ALJ necessarily found that the neuropathy could not cause concentration and attention deficits. Based on the ME's conclusions, the ALJ concluded that Plaintiff's symptoms from his mild neuropathy would distract him only rarely during a workday. (*Id.* at 291).

Plaintiff asserts that the ALJ did not support "her conjecture that physical therapy 'would be expected to improve the strength in [Plaintiff's] right leg.'" (Mot. 14). Dr. May referred Plaintiff to physical therapy in March 2006 after he hurt his right knee. (R. at 178–79, 183). Thus, it was Dr. May—and not the ALJ—who concluded that physical therapy would strengthen his leg. (*Id.* at 181 (listing one of the physi-

---

[13] The VE testified that someone whose concentration and attention is distracted more than 12% of a workday is incapable of work. (R. at 554).

cal therapy goals as "increase muscle strength on right & hip")). At Plaintiff's initial physical therapy session, the therapist reported that Plaintiff's knee was moderately swollen and that he had slightly reduced range of motion of the right knee and slightly reduced motor strength of the right lower extremity. (R. at 180–81). The therapist recommended a limited four-week regimen, and Plaintiff was discharged from physical therapy after only a couple treatments when he refused to continue. (*Id.* at 173, 181). Accordingly, the ALJ reasonably concluded that the limitations found in the initial physical therapy session were temporary. Indeed, as discussed above, a contemporaneous MRI was normal, Plaintiff's range of motion was sufficient to walk and stand, and subsequent physical examinations were largely unremarkable.

Finally, Plaintiff argues that in rejecting Dr. May's opinion, the ALJ failed to use the requisite checklist of factors when evaluating a treating physician's opinion. (Mot. 15). If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider a checklist of factors—"the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion"—to determine what weight to give the opinion. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); 20 C.F.R. § 404.1527. Here, the ALJ acknowledged that Plaintiff treated with Dr. May since 2004, but noted significant gaps in the treatment history. (R. at 292–96, 301–02). And, as discussed above, Dr. May's opinion was inconsistent with diagnostic tests and physical examinations.

Thus, the ALJ provided good reasons for giving Dr. May's opinion little weight. *See Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006) (ALJ justified in giving little weight to treating physician's opinion because it was contradicted by the medical evidence); *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010) (ALJ properly discounted treating physician's opinion because there were no "medically acceptable clinical and laboratory diagnostic techniques documenting the symptoms that supposedly would prevent [claimant] from working") (citation omitted).

In sum, the ALJ provided sound reasons, supported by substantial evidence, for not giving Dr. May's opinion controlling weight. The medical evidence does not support the extreme limitations opined by Dr. May.

## B. Substantial Evidence Supports ALJ's Credibility Determination

Plaintiff contends that the ALJ erred in discounting his testimony about the nature and extent of his ailments. (Mot. 18–20). He asserts that the ALJ erroneously discounted his credibility because of a lack of treatment. (*Id.* 19). He also contends that the ALJ failed to consider his limited activities, drug side effects, and missing medical records when assessing his credibility. (*Id.* 20).

An ALJ's credibility determination may be overturned only if it is "patently wrong." *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). In determining credibility, "an ALJ must consider several factors, including the claimant's daily activities, [his] level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano*, 556 F.3d at 562 (ci-

tations omitted); *see* 20 C.F.R. § 404.1529(c); Social Security Ruling (SSR)[14] 96-7p.

An ALJ may not discredit a claimant's testimony about his symptoms "solely because there is no objective medical evidence supporting it." *Villano*, 556 F.3d at 562 (citing SSR 96-7p; 20 C.F.R. § 404.1529(c)(2)); *see Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) ("The administrative law judge cannot disbelieve [the claimant's] testimony solely because it seems in excess of the 'objective' medical testimony."). Even if a claimant's symptoms are not supported *directly* by the medical evidence, the ALJ may not ignore *circumstantial* evidence, medical or lay, which does support claimant's credibility. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539–40 (7th Cir. 2003). Indeed, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted); *see* 20 C.F.R. § 404.1529(c); SSR 96-7p. "[W]hen a credibility finding rests on objective factors or fundamental implausibilities, rather than on a claimant's demeanor or other subjective factors, [the Court has] greater leeway to evaluate the ALJ's determination." *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013).

---

[14] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000); *see* 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably *bound* by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

The Court will uphold an ALJ's credibility finding if the ALJ gives specific reasons for that finding, supported by substantial evidence. *Moss*, 555 F.3d at 561. The ALJ's decision "must contain specific reasons for a credibility finding; the ALJ may not simply recite the factors that are described in the regulations." *Steele*, 290 F.3d at 942 (citation omitted); *see* SSR 96-7p. "Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed." *Steele*, 290 F.3d at 942. "An erroneous credibility finding requires remand unless the claimant's testimony is incredible on its face or the ALJ explains that the decision did not depend on the credibility finding." *Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014).

At the First Hearing, Plaintiff testified that he was unable to work because of the chronic pain and swelling he has in his right leg. (R. at 209, 222). Two or three times a week, the pain becomes so intense that Plaintiff has an "attack"; his whole leg shakes and he "balls up in a knot." (*Id.* at 224–25). On occasion, the pain causes his vision to become blurry. (*Id.* at 239). He is unable to do any household chores or to help his grandmother around the house. (*Id.* at 227–28). Plaintiff is able to lift about ten pounds and can stand for about 20 minutes before needing to sit. (*Id.* at 230). He can walk only a half block before needing a rest. (*Id.* at 231). He uses a cane for standing and walking. (*Id.* at 237). Plaintiff's pain makes it difficult to concentrate for more than 30 or 45 minutes at a time. (*Id.* at 236). He is often unable to sleep through the night because of sharp leg pain. (*Id.* at 234–35).

At the Second Hearing, Plaintiff described his pain as "sharp," which starts at his right knee and spreads down to his ankle and up to his back. (R. at 529). The sharp pain precipitates weakness in his knee, which causes him to fall down. (*Id.* at 534). The pain is sometimes accompanied by blurry vision and loss of concentration. (*Id.* at 535). On occasion, Plaintiff experiences what he describes as nerve spasms, which cause him to "ball up" in pain, shake, and lose consciousness. (*Id.* at 531). Plaintiff is unable to perform most household chores. (*Id.* at 536). He is able to keep his room clean and do light cooking and dishwashing, but otherwise his grandmother takes care of the house. (*Id.* at 536–37). When Plaintiff drives on rare occasions, he is able to use only his left leg. (*Id.* at 526–27). He testified that he can lift 20–30 pounds, walk 100 feet, and sit or stand for only 20 minutes before needing to change positions. (*Id.* at 538–39). Plaintiff uses a cane all the time and has difficulty climbing stairs. (*Id.* at 542).

After considering the medical evidence, the ALJ gave some credit to Plaintiff's complaints of knee pain (R. at 290, 297), but little credit to Plaintiff's testimony that he suffers from disabling limitations:

> First, as described in detail above, and corroborated by the testimony of [the ME], the objective medical evidence with respect to [Plaintiff's] lower extremities suggests relatively minor anatomical abnormalities, that would not be expected to cause the extreme pain and functional limitations [Plaintiff] described at the hearings. In addition, [Plaintiff] has made only minimal documented efforts to secure treatment for his alleged disabling pain and other limitations, sometimes waiting longer than a year during the relevant time even to return for routine medical care. [Plaintiff] obviously was familiar with the availability of the free Board of Health and Stroger Hospital services, and despite Dr. May's counsel and encouragement, failed frequently to avail himself of those services. [Plaintiff] did not submit evidence to show that he had any

treatment by any provider for any impairment after December 2009, and testified that he had only a single ER visit during that interval, in February 2011.

The prescription bottles brought to the First Hearing, reportedly reflecting all of the prescriptions [Plaintiff] filled during the relevant time, show that [Plaintiff] only rarely took prescription strength analgesic medication, although he testified to virtually constant and excruciating pain, unrelieved with over-the-counter medication he more typically used. While [Plaintiff] testified at the First Hearing that [he] took two tablets of Tylenol #3 every day, he apparently had only rarely sought or filled such prescriptions before the First Hearing. [Plaintiff] testified at the Second Hearing that he had filled prescriptions at Walgreen's, but he failed to submit documentation I requested to corroborate that testimony, or to explain his failure to do so. Since he did not have significant medical treatment during the long period between hearings, it seems unlikely that he was prescribed medication during that time.

[Plaintiff's] earlier testimony and prior reports about his other complaints, including his "attacks," the knot on his side, and his heart murmur, also are not fully credible. Examining physicians generally have not detected the knot or the heart murmur, and [Plaintiff] admitted, despite the remarkable description of the extent and frequency of the "attacks," from both [Plaintiff] and his grandmother at the First Hearing, that he had not mentioned those episodes to his treating and examining physicians, nor sought further information about the possible cause of those events. [Plaintiff] did apparently tell Dr. May [some]time after the First Hearing that he had episodes of "falling out," but an EEG was normal and [Plaintiff] has not otherwise been treated for that problem. He also did not continue to make those complaints after the EEG was done.

(*Id.* at 301–02).

Plaintiff contends that the ALJ erred by emphasizing the objective evidence rather than his subjective complaints. (Mot. 18–19). While the Seventh Circuit emphasizes that "an ALJ cannot disregard subjective complaints of disabling pain just because a determinable basis for pain of that intensity does not stand out in the medical record," *Moss*, 555 F.3d at 561 (citing SSR 96-7p), the evaluation of subjec-

tive complaints is a two-step process. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) . . . that could reasonably be expected to produce the individual's pain or other symptoms." SSR 96-7p, at *2; *see* 20 C.F.R. § 404.1529(b). "Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." SSR 96-7p, at *2; *see* 20 C.F.R. § 416.929(c). Here, as discussed above, the ALJ concluded that while there was some support for Plaintiff's complaints of knee pain, the medical record contained *no* objective evidence explaining Plaintiff's disabling symptoms. *See* SSR 96-8p, at *5 (the RFC assessment includes the "effects of symptoms, including pain, that are *reasonably attributed* to a medically determinable impairment") (emphasis added).

In any event, the ALJ did not base her credibility determination solely on the lack of objective evidence. 20 C.F.R. § 404.929(c)(2) ("[W]e will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work . . . *solely* because the available objective medical evidence does not substantiate your statements.") (emphasis added); *Pierce*, 739 F.3d at 1050 ("[T]he lack of objective support from physical examinations and test results is still relevant even if an ALJ may not base a decision solely on the lack of objective corroboration of complaints of pain."). Instead,

the ALJ discounted Plaintiff's credibility because he made only minimal efforts to secure treatment and medications despite his claims of disabling pain; rarely took prescription-strength analgesic medication although he testified to almost constant and excruciating pain; and failed to substantiate his other complaints, including his "attacks," the knot in his side, and the heart murmur, despite his detailed description of their extent and frequency. (R. at 301–02).

Plaintiff argues that the ALJ improperly focused on Plaintiff's minimal treatment records without "record evidence that additional treatment modalities would be of benefit to [Plaintiff]." (Mot. 19). But an ALJ may reasonably conclude that the failure to seek additional medical treatment, or even routine treatment, is inconsistent with claims of debilitating pain. *See Haynes v. Barnhart*, 416 F.3d 621, 630 (7th Cir. 2005) (claimant's failure to seek "any additional medical treatment either for his pulmonary problems or his heel pain in the two years since January 1999 . . . was inconsistent with the notion that [claimant] may have continued to suffer from serious medical problems"). Here, the medical record is devoid of any evidence to suggest that Plaintiff's doctors tried alternative pain regimens or that any additional modalities would have been futile. *Cf. Thomas*, 2014 WL 929150, at *2 (finding that the ALJ improperly discredited claimant's testimony where "the treatment records are replete with notes that the pain medication was not helping"). Indeed, Plaintiff only rarely took prescription strength analgesic medication, although claiming his "excruciating" pain was unrelieved by over-the-counter medicines. While he testified at the Second Hearing that he had filled recent prescriptions at

Walgreen's, he failed to submit the requested documentation, despite given months to do so. (R. at 286, 342–50, 517, 533, 558). Plaintiff contends that despite the missing prescription records, being "prescribed strong pain medications such as Vicodin . . . bolsters [his] claim." But it is not whether Plaintiff was *prescribed* medications that undermined Plaintiff's credibility. Rather, it was Plaintiff's *failure* to consistently take his prescription pain medications or to inquire about alternative pain relief regimens.[15]

Finally, Plaintiff complains that the ALJ failed to acknowledge that his treatment records with Dr. May after 2009 were destroyed by storm water damage. (Mot. 19; *see* R. at 514). But as discussed above and as emphasized by the ALJ, there were significant gaps in Plaintiff's treatment history with Dr. May even *before* 2009. (R. at 292–96, 301–02). And, while given an opportunity to supplement the record, Plaintiff failed to provide records from Rush Medical Center for a hospitalization that he alleged occurred in January 2011. (*Id.* at 286, 342–50, 516–17, 558).

In sum, the ALJ concluded that, when viewed together, Plaintiff's gaps in treatment, the objective medical evidence, and sparse use of prescription-strength medication undermined Plaintiff's credibility when describing his disability. "These are exactly the type of factors the ALJ was required to consider." *Pepper v. Colvin*, 712 F.3d 351, 369 (7th Cir. 2013). The ALJ provided specific reasons for his credibility finding, supported by substantial evidence. *Moss*, 555 F.3d at 561; *Steele*, 290 F.3d

---

[15] Further, while Plaintiff alleges that his medications cause dizziness (R. at 83; Mot. 20), there is *no* indication in the medical records that he complained about dizziness to his doctors.

at 942. The ALJ built a logical bridge between the entire case record—including the medical evidence, Plaintiff's statements, and other relevant evidence—and her conclusion. *Schideler v. Astrue*, 688 F.3d 306, 312 (7th Cir. 2012); *Arnold*, 473 F.3d at 823; SSR 96-7p.

## C. Substantial Evidence Supports ALJ's RFC Determination

The ALJ determined that Plaintiff's mild obesity is a severe impairment. (R. at 288). After examining the medical evidence and giving partial credibility to some of Plaintiff's subjective complaints, the ALJ found that Plaintiff has the RFC to perform a wide range of light and sedentary work,[16] except he should not do constant repetitive pushing or pulling against resistance with the right lower extremity; should never climb ladders, ropes or scaffolds or work on moving or unstable surfaces; and should not do work that would expose him to unprotected heights or unguarded hazardous equipment. (*Id.* at 290–91).

Plaintiff argues that the ALJ erred in her RFC determination by failing to include limitations for his need to ambulate with a cane. (Mot. 7–13). He contends that the ALJ failed to properly assess the record evidence of his cane use and selectively relied on the ME's testimony. (*Id.* 8). The Plaintiff also contends that the ALJ failed to properly consider the impact of his obesity on his ability to work. (*Id.* 17–18). Finally, Plaintiff argues that the ALJ's RFC lacks support in the medical record. (*Id.* 15–17). He contends that by rejecting all physician opinion evidence and

---

[16] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. . . . Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(a)–(b).

filling the evidentiary gaps with her own opinion, the ALJ failed to provide a reasoned explanation for concluding that Plaintiff could perform a limited range of light and sedentary work. (*Id.* 16).

"The RFC is an assessment of what work-related activities the claimant can perform despite her limitations." *Young*, 362 F.3d at 1000; see 20 C.F.R. § 404.1545(a)(1) ("Your residual functional capacity is the most you can still do despite your limitations."); SSR 96-8p, at *2 ("RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."). The RFC is based upon medical evidence as well as other evidence, such as testimony by the claimant or his friends and family. *Craft*, 539 F.3d at 676. In assessing a claimant's RFC, "the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe," and may not dismiss evidence contrary to the ALJ's determination. *Villano*, 556 F.3d at 563; see 20 C.F.R. § 404.1545(a)(1) ("We will assess your residual functional capacity based on all relevant evidence in your case record."); SSR 96-8p, at *7 ("The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence.").

After carefully examining the record, the Court finds that the ALJ's determination of Plaintiff's RFC was thorough, thoughtful, and fully grounded in the medical

evidence, including physicians' opinions and Plaintiff's testimony. Plaintiff reported that because of his difficulty with balancing and walking, he needed a cane for both walking and standing. (R. at 9, 111, 227, 237, 267, 396, 420, 434, 463, 542). He argues that his testimony was corroborated by his treating physician, Dr. May, who opined that Plaintiff requires a cane to stand and walk. (Mot. 7; *see* R. at 169). But as discussed above, substantial evidence supports the ALJ's rejections of Dr. May's opinion and Plaintiff's credibility. While there is other evidence documenting Plaintiff's use of a cane (R. at 111–12, 181, 434, 463, 470, 492–94, 506), the ALJ properly adopted the ME's testimony that the cane was not medically necessary (*id.* at 288, 289, 546–48). The ME—an orthopaedic specialist—found *no* objective pathology to explain Plaintiff's symptoms and *no* medical evidence indicating a functional impairment to Plaintiff's leg. (*Id.* at 546–48). Diagnostic tests and physical examinations were largely unremarkable. (*See, e.g., id.* at 160 (x-ray normal), 124–26 (x-ray showed mild soft tissue swelling but no fracture), 181 (flexion in knee sufficient to walk and stand), 459 (EEG normal), 434 (no limitation of motion of any joint, including flexion, dorsiflexion and plantar flexion in right leg sufficient to walk and stand), 447–48, 450–51, 455, 497–98, 501–02, 505–06).

Nevertheless, Plaintiff contends that his need for a cane is substantiated by two examining physicians (Drs. Ryan and Weiss), two state-agency nonexamining physicians, and other record evidence. (Reply 6). But while Drs. Ryan and Weiss opined that Plaintiff was unable to ambulate more than 10–20 feet without his cane (*id.* at 112, 466), the diagnostic tests they performed indicated that despite Plaintiff's right

knee pain, he had no functional limitations which prevented him from walking and standing (*id.* at 112, 465, 467; *see supra* note 6). And after Dr. Ryan's assessment, two state-agency physicians reviewed the file and concluded that Plaintiff's impairments were nonsevere.[17] (*Id.* at 54–55, 57–61). As the ALJ observed, Dr. Weiss's assessment was contradicted by Dr. Rana's evaluation, which occurred less than six months prior to Dr. Weiss's. (R. at 434–36, 463–68, 469–76). In June 2008, Dr. Rana opined that while Plaintiff walks with a limp, he can walk more than 50 feet without his cane. (*Id.* at 436). Dr. Rana also found that flexion of Plaintiff's right knee and dorsiflexion and plantar flexion of the right ankle were sufficient to allow for normal walking. (*Id.* at 434; *see supra* note 10). In July 2008, a state-agency physician reviewed the file, including Dr. Rana's assessment, concluded that Plaintiff's "limitations were minimal," and recommended that his claim be "denied as nonsevere." (*Id.* at 437–39).[18] It is the ALJ's duty to resolve inconsistencies in the evidence. SSR 96-8p, at *7; *Martinez v. Barnhart*, No. 02 C 2354, 2004 WL 2663193, at *1 (N.D. Ill. Feb. 23, 2004). Here, based on her review of the entire record, including evidence favorable to Plaintiff (R. at 288–97), the ALJ reasonably determined that

---

[17] Plaintiff faults the ALJ for not explicitly addressing Dr. Ryan's opinion. (Reply 4–5). But the ALJ need not mention every piece of medical evidence in her opinion, as long as she does not completely ignore a line of evidence contrary to her conclusion. *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012). Here, the ALJ acknowledged the evidence suggesting Plaintiff's need for a cane, and explained her reasons for rejecting it. (R. at 291–97).

[18] In January and March 2009, two different state-agency physicians found that Plaintiff needed an assistive device to stand and walk. (R. at 469–76, 492–94). However, there is no indication that these state-agency physicians reviewed Dr. Rana's assessment or any of the previous three state-agency physician's opinions finding Plaintiff not disabled. (*Id.* at 476, 494). On the contrary, it appears that the state-agency physicians reviewed only Dr. Weiss's evaluation and Dr. May's October 29, 2008 notes. (*Id.*). The ME opined that these state-agency assessments were not supported by the complete medical record. (*Id.* at 547–48).

the objective medical evidence did not establish that Plaintiff's cane was a medical necessity (*id.* at 288).

Plaintiff also contends that the ALJ's reliance on an orthopaedic specialist was misplaced because "Plaintiff does not have a bone issue but a nerve and soft tissue issue exacerbated by obesity." (Reply 7). But there is *no* evidence to contradict the ME's conclusion that Plaintiff's neuropathy was mild and caused no functional limitations. (*Id.* at 546; *accord id.* at 289). The only nerve conduction study in the record indicated *mild* abnormalities in the superficial peroneal and sural nerves of the right leg, with *superficial to mild effects* on Plaintiff's lower leg and foot. (R. at 143–45).

Next, Plaintiff complains that the ALJ failed to consider the impact of his obesity in determining his RFC. (Mot. 17–18). On the contrary, the ALJ explicitly found that Plaintiff's obesity is a severe impairment and that it prevents him from performing strenuous work. (R. at 288–89, 297). Moreover, in determining Plaintiff's RFC, the ALJ explicitly considered the aggregate impact of his obesity and his other nonsevere impairments and concluded that Plaintiff's obesity exacerbated his otherwise mild knee and leg impairments. (*Id.* at 289–97). Accordingly, "because of [Plaintiff's] mild obesity and complaints of knee pain," the ALJ limited him to a reduced range of light and strenuous work, restricting him from climbing ladders, ropes or scaffolds, or working on moving or unstable surfaces, unprotected heights or unguarded hazardous equipment. (*Id.* at 290–91).

Finally, Plaintiff contends that the ALJ's RFC determination lacks evidentiary support because she did not expressly rely on any of the medical opinions in the record. (Mot. 15–17). He argues that the ALJ could not make an RFC determination without securing additional medical support. (*Id.*). On the contrary, "the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions any of the claimant's physicians." *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007). Instead, the RFC assessment "is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, . . . an individual's own statement of what he or she is able or unable to do, and many other factors that could help the [ALJ] determine the most reasonable findings in light of all the evidence." SSR 96-5p, at *5. And that is what the ALJ did here. She thoroughly considered all the evidence, gave substantial weight to the ME's opinion, and some weight to the Dr. May's opinion and to Plaintiff's testimony:

> The rest of Dr. May's opinion suggests that [Plaintiff] could perform a wide range of sedentary and even some light work.
>
> I give substantial weight to the opinion of [the ME] that the objective medical evidence does not establish impairments that would be expected to cause significant functional limitations, to require [Plaintiff] to use a cane for ambulation, or to require a sit/stand option in the workplace. [The ME] is an orthopedic specialist, he had the opportunity to review all the relevant medical evidence, and the opportunity to observe [Plaintiff] during the hearing. I give some credit to [Plaintiff's] testimony, however, that he does suffer from knee pain, and his mild obesity interferes with his ability to do strenuous work.

(R. at 297; *see id.* at 290–302). The ALJ's RFC is consistent with Dr. May's conclusion that Plaintiff could frequently lift 10 pounds and occasionally lift 20 pounds

and could occasionally twist, stoop, crouch/squat, and climb stairs. (*Compare id.* at 169 *with id.* at 290–91). The RFC is also consistent with the ME's opinion that Plaintiff has mild obesity and Plaintiff's testimony that his old gunshot wound continues to cause him some knee pain. (*Compare id.* at 290–91 *with id.* at 546–48).

In sum, the Court finds that the ALJ did not err in her determination of Plaintiff's RFC. She fulfilled her responsibility to determine Plaintiff's RFC after weighing the medical source statements and other evidence in the record. *See* SSR 96-5p, at *2 (the determination of an individual's RFC is not a medical issue; instead, it is an administrative finding dispositive of a case). Substantial evidence supports the ALJ's determination that Plaintiff can perform a limited range of light and sedentary work.

## VI. CONCLUSION

For the reasons stated above, Plaintiff's request to reverse the ALJ's decision and remand for additional proceedings is **DENIED**. Defendant's Motion for Summary Judgment [31] is **GRANTED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is **AFFIRMED**.

E N T E R:

Dated: March 21, 2014

_Mary M Rowland_
_____
MARY M. ROWLAND
United States Magistrate Judge